**STANDARD OPTICAL COMPANY et al.,**
**Plaintiffs and Appellants,**

v.

**SALT LAKE CITY CORPORATION et al.,**
**Defendants and Respondents.**

**STANDARD OPTICAL COMPANY,**
**Plaintiff and Appellant,**

v.

**Lawrence A. JONES, as Salt Lake City Auditor, et al., Defendants and Respondents.**

**No. 13924.**

Supreme Court of Utah.

May 9, 1975.

Frank J. Gustin of Gustin & Gustin, Salt Lake City, for plaintiffs and appellants.

Roger F. Cutler, Salt Lake City Atty., Bryce E. Roe of Roe & Fowler, Salt Lake City, for defendants and respondents.

ELLETT, Justice:

The defendants had for a number of years considered forming a special improvement district for downtown Salt Lake City. They had appointed an ad hoc citizens committee for the purpose of considering the nature of the improvements which should be made.

In December, 1973, the city engineer submitted to the Board of Salt Lake City Commissioners a cost estimate of the proposed improvement, which was approved by the Board. A Notice of Intention was prepared by the city attorney and approved by the Board providing that it was the intention to make the following described improvements:

> To remove all existing curbs, gutters, sidewalks and street paving and construct new street paving, pedestrian paving, landscape structures, planters and planting, curbs and gutters, together with new street lighting and drainage structures, and to do all other work necessary to complete the project in accordance with Salt Lake City Standards.

The Notice of Intention further provided:

> All other necessary things shall be done to complete the whole project in a proper and workmanlike manner according to plans, profiles and specifications on file in the office of the Salt Lake City Engineer. . . .

It set forth the boundaries of the proposed district and the estimated cost of the improvements. The property owners were to be assessed a charge of not to exceed $505 per front foot, and the city was to pay the remainder of the estimated cost in the amount of $872,405.20. It further provided that protests should be filed on or before January 16, 1974, and that any protests so filed would be considered on January 17, 1974.

The Notice of Intention was published pursuant to law,[1] and on December 26, 1973, a copy thereof was duly mailed to the registered owners of each lot, parcel or plot of real property located within the proposed Special Improvement District.

On January 17, 1974, at a regularly scheduled meeting of the Board of City Commissioners all written protests were received, filed, and referred to the city engineer, the city attorney, and the Planning and Zoning Department for reports and tabulation. Furthermore, every person present at the meeting was given an opportunity to make protest and to state any objections which he cared to make to the proposed Special Improvement District. It was then decided that a second meeting should be held after a complete tabulation of the written protests was made.

The next day a notice was sent to all registered property owners within the proposed district requesting their attendance at the second meeting to be held on January 25, 1974, at 2:00 p. m., in the commission chambers. In addition thereto, notice of the meeting was published on January 21, 1974, in a newspaper having general circulation in the city and county.

A tabulation of the protests filed showed that less than two thirds of the owners of the property to be assessed were opposed to the proposed district, to wit, only 49.15 per cent, or, if three questionable protests were counted, there would be 51.23 per cent.

At the announced meeting on January 25, 1974, there were more people in attendance than there had been at the meeting held January 17, 1974. All of the plaintiffs herein were either present in person or through counsel, and all who desired to speak either for or against the proposed district were given an opportunity to do so. After the meeting a number of those who previously had protested the matter withdrew their protests, so that the final number of protestants was only 44.4 per cent of the total owners within the district.

On or about February 13, 1974, the defendants approved the plans and specifications of the architect and caused to be duly published a notice to contractors requesting the submission of bids to be opened on March 7, 1974, The date of opening the bids was subsequently postponed until March 21, 1974. Only two bids were received, each on a "line item" basis, but at a price greatly in excess of the estimated cost of the improvement.

1. Sec. 10-16-5, U.C.A.1953 as amended (Replacement Vol. 2A).

Because of the assurance given by the city to the property owners that the cost would not exceed $505 per front foot, the city undertook to eliminate or change some of the proposed improvements.

Based upon the opinion of the consulting architects and the facts before the city commission, it was determined to make certain modifications and deletions which would have no adverse effects on the aesthetic appearance or the overall general utility of the project. Thereafter a "Target Vitality" summary sheet containing possible revisions to the lowest base bid was prepared which brought the cost of the project to a figure within the original estimate.

A notice of another meeting to be held April 16, 1974, was sent to all property owners. A summary of the proposed changes patterned after the "Target Vitality" summary was distributed to all persons attending the meeting, and all persons desiring to be heard were permitted to speak.

The adjusted line bid of Gibbons & Reed Company as computed by the city was below the engineer's preliminary estimate and below a similarly adjusted bid of Shocker Construction Company, the other bidder on the project. The contract was thereupon awarded to Gibbons & Reed Company.

The appellants claim that the formation of Improvement District Curb and Gutter Extension No. 38–480 was irregular and contrary to law because certain changes in the vehicular-traveled portion of the street were not stated in the Notice of Intention and were not made by a regularly enacted ordinance. They also claim that the contract with Gibbons & Reed Company was not awarded pursuant to law. They make other assertions of error as offshoots of the foregoing.

To begin with, it is to be noted that the establishment of an improvement district by a municipality in pursuance of statutory power is a legislative act which is conclusive in the absence of any evidence that it was procured by fraud or of proof that it is manifestly arbitrary or unreasonable or unjust and oppressive.[2]

There can be no claim of fraud in regard to this matter, nor is there anything arbitrary, unreasonable, unjust or oppressive about it. If there could be any such claim, the burden of proving the same would be upon the plaintiffs herein,[3] and there is no evidence to justify it.

The appellants assert that by deleting certain of the plans and specifications and inserting new ones in the contract, particularly in narrowing that part of the street used for vehicular traffic, the city did not act in accordance with law, and that had the property owners known that such was to be done, there would have been more protests filed, to wit, more than two thirds, which under the statute[4] would have prevented the formation of the district. They rely upon the case of Gwilliam v. Ogden City[5] in support of their claim. However, since that case was decided, the law regarding the notice of intention existing at the time has been repealed and a new law[6] enacted which only requires that the improvements proposed be described in a general way. Not only were the improvements described generally in the notice of intention, but the notice specifically referred to the plans and specifications in the office of the city engineer.

In the case of Williams v. City of Caldwell[7] the ordinance of intention provided, "That the character of the proposed lateral sewer system shall be that of gravity, and according to the plans and specifica-

2. 14 McQuillin Mun.Corp. (3rd Ed., 1970 Revised Volume) § 38.56.

3. Feldhake v. City of Santa Fe, 61 N.M. 348, 300 P.2d 934 (1956).

4. Section 10–16–7, U.C.A.1953 as amended (Replacement Vol. 2A).

5. 49 Utah 555, 164 P. 1022 (1917).

6. Sec. 10–16–5(d), U.C.A.1953 as amended (Replacement Vol. 2A).

7. 19 Idaho 514, 114 P. 519 (1911).

tions now on file in the office of the city engineer of the city of Caldwell." In that case it was contended that the ordinance of intention did not sufficiently describe the character of the proposed improvement as required by the statute. In holding the ordinance sufficient, the Idaho Supreme Court held that the reference to the plans and specifications was sufficient to give notice to all parties interested in the general character of the proposed works.

As regards the narrowing of that portion of the street used for vehicular traffic, the appellants assert that the street was narrowed without an ordinance being passed to that effect as required by Section 10–8–8.2, U.C.A.1953 (Replacement Vol. 2A), which provides:

> . . . When in the opinion of the governing body of the city there is good cause for vacating, or narrowing the street . . ., it may, by ordinance, . . vacate or narrow such street.

In the improvement proposed by the city the sidewalks are to be widened, and that part of the street used by vehicles is to be narrowed. The width of the street itself is not affected, as the street extends from property line to property line,[8] and the city can under its police power designate the portions of the street which shall be used by pedestrians and which part by vehicles and horses.

As to the contract with Gibbons & Reed, the city considered calling for new bids, but costs were rising rapidly and unless the bids as made were accepted, the cost of the project would be greatly increased. Both bids which had been received were made on a line item basis, and since no significant change was made in the overall appearance or utility of the project, the decision of the city to adjust the proposals seemed to be wise. The bid of Gibbons & Reed Company was the low bid when considered on the line item basis. No other bidder or prospective bidder makes any challenge to the procedure, and the plaintiffs obviously are not and were not interested in having a new set of bids called for. They simply do not want the improvements to be made. They may be justified in seeking to avoid paying $505. per front foot, which the project requires. It may be that they will sustain a loss of business during the period of time in which the street and the sidewalk will be torn up. However, the defendants have the power to make the determination of establishing the improvement district unless two thirds of the abutting owners protest the proposal. Since over one half of the owners make no protest to the matter, these plaintiffs cannot prevent the work because they feel that it will not benefit them individually.[9]

We are of the opinion that the requirements of the statute were sufficiently complied with in the forming of the special improvement district and that the trial court was correct in so holding. The judgment is affirmed. No costs are awarded.

CROCKETT, J., concurs.

TUCKETT, J., concurs in the result.

HENRIOD, Chief Justice (dissenting).

Without any considerable disagreement with the method of approach of the main opinion, I respectfully dissent, with a different tack, for the following reasons:

1. I find nothing in the statement of facts of any of the parties, or in the "Notice of Intention" itself to create the so-called "Improvement District." Such Notice of Agreement is the basic document that presumably would notify, not

8. Stringham v. Salt Lake City, 114 Utah 517, 201 P.2d 758 (1949); Davidson v. Utah Independent Telephone Co., 34 Utah 249, 97 P. 124 (1908).

9. The Chief Justice in his dissent speaks of the closing of Main Street. That street is not closed at all. At the South Temple Street intersection with Main Street, there is a monument in the middle of the street which has for years been somewhat of an impediment to north-south traffic. Now, north and southbound traffic will be required to detour to the right for one block only.

only the property owners on Main Street, I take it, but the citizens of Utah, all of whom, since 1914, have had an interest in Main Street as a means of ingress and egress to the State Capitol Building, to Ogden, and other points north—that Main Street would be closed to such ingress and egress from south of South Temple, and through the South Temple intersection, to vehicular traffic going both north and south.

There is nothing in the Notice of Intention itself that proposes the closing of a street in this unorthodox fashion. There would seem to be no question that if the closure of Main Street 50 feet south or north of its present Berlin Wall had been attempted under this so-called Notice of Intention, it would have been offensive to the general language of the Notice of Intention, and to the public,—and the fact that one might detour to the east or west in the present case is not an "easy out" either to get to the Capitol Building or to justify deception. The Notice of Intention authorizes the City to

> remove all existing curbs, gutters, sidewalks and street paving and to construct *new* street paving, pedestrian and planting, curbs and gutters . . .

using the wording of Title 10-8-8, U.C.A. 1953, but significantly not using the word to "vacate" the street as the city might do by proper procedure.

Had the people generally known that besides altering *"existing* curbs, gutters, sidewalks and street *paving"* the City was going to close Main Street to vehicular travel at one point, with the ensuing inconvenience, confusion and even hazard incident to such closure, the project well may have died of public pressure. The fait accompli *after* construction, uncovers and denudes the deception of the Notice of Intention,—which had no inkling, warning or suggestion that a main artery of vehicular travel was to be walled out, and such fait accompli should not be any reason to affirm the trial court. This barrier, in truth, being built to affect a thoroughfare that actually appears to be *beyond* and *outside* the legal description incorporated in the published notices, was thrust upon a disarmed and unsuspecting citizenry.

2. The project should be declared abortive, for similar reasons, since there is not a smidgeon of language in the Notice of Intention (except by way of reference, which does not seem either proper or fair or effective for such a major change), that the pedestrian area would be widened by 24 feet (the equivalent of two lanes that theretofore, since the phrase "This is the Place," that has been synonymous with wide thoroughfares,—not only commanding the respect and commendation of the world, but representing the epitome of practicality and maximum utility), and the shrinking of the curb to curb vehicular area by the same footage. The whole tenor of the language in the Notice of Intention is to the effect that the *old* sidewalks would be *replaced* by *new* sidewalks, *not expanded by 24 feet*; and that the *old* paving part of the thoroughfare simply would be *repaved*, not only on two thirds or one half thereof.

It is obvious that the main opinion has dedicated itself, *not to the limitations represented in the Notice* of Intention, but to a peripatetic evasive action to defeat them, by referring to and assuming authority given cities *in the statute* controlled—which contrariwise seems to have little or nothing to do with this case. This is not a case of what a city *might* do under a statute. It is a case of what the Notice of Intention said the City *intended* to do, and there is nothing in the language used to notify the average citizen of what is to occur. If the main opinion is accepted, under such Notice of Intention, express authority could have been given the City, under the main opinion *in this case,* to have substituted a 50-foot walkway on the west and a 50-foot walkway on the east, with a 20-foot paved lane, taking up the remaining 20 feet of the 120 feet of this street, for vehicular use, from Third South to South Temple, where such a pleasant

bicycle path, so to speak, would end in a cul de sac. If this Notice of Intention language in any imaginative way can justify the juxtapositional widths of pedestrian and vehicular areas in the instant case (as the main opinion says it can do) —by a 24 foot expansion in the one case and shrinkage of 24 feet in the other, there is no reason why under such decision, it could not under a similar Notice of Intention, expand the sidewalks to 55 feet on each side of the street with but a 10-foot construction of "new street paving," all of which, to this writer, would loom pretty ridiculous.

This court should declare the Notice of Intention specifically to be limited in its general language pointing to replacement and beauty,—not closure and widening, and declare that any deviation from its language, by widening or shrinking the pedestrian and/or vehicular areas of the street, is vulnerable and subject to remedial legal procedures.

In passing, it is the opinion of this author that the reliance of counsel for respondent on the percentage vote of property owners, is misplaced since suffrage or percentages really seem to have little to do with this case. In support of such conclusion, it is appropriate to repeat what has been said above, that *this is not a case of what a city might do under a statute*; it is a case of what the Notice of Intention represented to the people said it *intended to do*,—and the widening and/or shrinking of the sidewalks and/or the vehicular area, are not suggested by name or definition or at all in the so-called Notice of Intention.

I think the omnibus clause in the Notice of Intention, saying "according to specifications on file" is no substitute for reasonable specificity in the general statement of intent and purpose, where the change from the old status quo to the new, is of such magnitude, that the omnibus clause is of an unwarranted hide and seek character as to result, not in reasonable disclosure as to what is going to be done, so that the people would know the enormity of the change, but actually represents a furtive concealment of the facts from the people, who justifiably may have relied on what appeared to be simply a change in the topography and beauty of the sidewalks and the thoroughfare,—not their widths or complete closure thereof. (All emphasis added.)

MAUGHAN, Justice (dissenting).

Respectfully, I dissent. The notice of intention failed to meet the requisite standard of substantial compliance with the mandatory provisions of Section 10–16–5(1)(a)(d), U.C.A.1953, as amended in 1969. This court has consistently held that deficiencies in the procedures for the establishment of a special improvement district are jurisdictional.[1]

Section 10–16–5, U.C.A.1953, as amended in 1969, provides:

> Before a special improvement district is created, the governing body shall give notice of its intention to make the improvements and to levy assessments to pay all or part of the cost thereof. The notice shall:
>
> (a) State the purpose for which the assessments are to be levied.
>
> * * * * * *
>
> (d) In a general way, describe the improvements proposed to be made showing the places the improvements are proposed to be made and the general nature of the improvements. The improvements may be described by type or kind and the places such improvements are proposed to be made may be described by reference to streets or portions of streets or extensions of streets or by any other means the governing body may choose which reasonably describes the improvements proposed to be made.

Salt Lake City in its brief states:

> a. The *purpose* for the assessment was:
>
> To remove all existing curbs, gutters, sidewalks and street paving and to con-

1. Lewis v. Kanab City, Utah, 523 P.2d 417 (1974), see cases cited therein in footnote 1.

struct new street paving, pedestrian and planting, curb and gutters, together with new street lighting and draining structures, and to do all other work necessary to complete the project in accordance with Salt Lake City standards.

* * * * * *

All other necessary things shall be done to complete the whole project in a proper and workmanlike manner according to the plans, profiles, and specifications on file in the office of the Salt Lake City Engineer. . . .

b. The *nature* of the improvements was to install and construct new curbs, gutters, sidewalks and street paving, together with pedestrian paving, landscape structures, planters and planting materials. Also new street lighting and draining structures would be constructed, together with those more specific items and alterations on file as plans, profiles and specifications in the Salt Lake City Engineer's Office. [Emphasis supplied.]

The trial court had no difficulty in finding that three significant proposed improvements were not described in the notice of intention, and could only be determined by reference to the plans, profiles and specifications on file in the office of the Salt Lake City engineer. These three items were:

1. The narrowing of the vehicular traveled portion of Main Street by approximately 24 feet.

2. The lowering of the grade of the street by approximately one foot between South Temple and Third South.

3. The blocking of north-south traffic on Main Street by enlarging the base of the monument situated at the intersection of Main Street and South Temple Street.

Appellant correctly urges that the notice of intention did not advise the property owners of these radical changes. The effect of these changes is to convert a heavily traveled thoroughfare into a restricted access route, and in effect to change the subject area into a pedestrian mall.

It can hardly be said that the three excluded proposed improvements can be drawn from the notice of intention prepared by the City, part of which is set out above. Nor can it be said that the three excluded proposed improvements are any less important than those set out in the notice of intention. Indeed, the three excluded proposed improvements, on their face, change the subject area in more radical ways than those set forth in the notice of intention.

Municipalities exercise their powers in projects of this magnitude by ordinance. Two of the purposes of an ordinance is to give *notice, and provide an opportunity to be heard*, which also include the opportunity to object to, and defeat the proposed action of the municipality. The legislature has seen fit to provide that the establishment of grades and the narrowing of streets are of sufficiently grave natures, as to require them to be done by ordinance.[2] Any ordinance which failed to specify the action to be taken would be defective.[3]

In Gwilliam v. Ogden City[4] notice was given to the abutting property owners that the City proposed to create a curb and gutter district and to build therein concrete curbs and gutters and to do the necessary grading therefor. In doing the work the street grade was lowered in places, slightly in excess of one foot. In their action plaintiffs contended that the City was not authorized to lower the grade, and to assess the cost thereof, because such grading was not specified in the notice of intention.

This court there cited Compiled Laws of 1907, Section 273, which provided that the notice of intention must include the purposes for which the taxes are to be levied,

2. Secs. 10-8-8 and 10-8-8.2, U.C.A.1953.

3. Boskovich v. Midvale City, 121 Utah 445, 447, 243 P.2d 435.

4. 49 Utah 555, 164 P. 1022 (1917).

and "describe the improvements so proposed". The court further said:

> . . . the abutting property owners whose property would thus be affected by the improvement, might have been quite willing to have the improvements made as stated in the notice, and therefore may have made no protest, as they might have done under section 273, supra. . . . The property owners may thus again have been induced not to protest, while if they had been informed that the street grade was also to be lowered, they might have offered timely objection to doing that part of the work . . . .[5]

The court went on to explain that the matters set forth in Section 273, with which the City must comply, were jurisdictional, and without such compliance the City was without power, or jurisdiction, to impose a special assessment, to defray the cost of the improvement. Being jurisdictional, the defect in the notice of intention rendered the tax illegal as far as the grading of the street was concerned, because it was the same as though no notice had been given.

In Gwilliam, it is important to note that the notice of intention was held to be defective in two essentials: (1) in not naming correctly the purposes for which the taxes were to be levied; and (2) in not describing the grading as a proposed improvement. It is, in this particular that the statement in the main opinion is inaccurate, viz., that the amendment of the staute rendered Gwilliam inapplicable here. The Gwilliam case is applicable in the instant action and should control the disposition herein.

The trial court and the main opinion say that the amendment of the statute has altered the mandatory requirement that the proposed improvements be described in the notice of intention, viz., because the improvements may be described "in a general way." However, let us look at 13 McQuillin, Municipal Corporations, 1971, Revised Edition, Section 37.43, where this statutory phrase is examined and explained, as follows:

> Under some laws, however, notice only in a general way is required. But the judicial decisions are reasonably uniform in sustaining the sound and salutary proposition that the improvement should be described in such a manner that an interested property owner may judge with reasonable certainty the effect it will have on his property. Obviously property owners who will have to pay the cost of the improvement, or else have their property sold to satisfy the same, should be apprised in the notice of the character and extent of the improvement. The notice may refer to plans and specifications, describing them, and stating where they can be seen. The improvement will be limited to the street named in the notice.

The footnote to the penultimate sentence in the foregoing citation refers us to Id., Section 37.85, which reads as follows:

> Description by reference to documents, maps, plans, specifications, etc., on file, or in official custody, has received judicial indorsement. *Such reference, however, should be confined to mere details. The ordinance resolution itself should contain a substantial description of everything relating to the proposed improvement required by charter.* [Emphasis supplied.]

It certainly cannot be concluded that (1) the narrowing of the vehicular traveled portion of Main Street by approximately 24 feet, (2) the lowering of the grade of the street by approximately one foot between South Temple and Third South Streets, (3) the blocking of north-south traffic on Main Street by enlarging the base of the monument situated at the intersection of Main and South Temple Streets; are *"mere details."*

The notice of intention totally failed to apprise interested property owners of the

5. 49 Utah pp. 561-562, 164 Pp. 1024.

*purposes,* and a *description,* of the improvements proposed. A landowner is not required to employ an engineer to decipher plans and specifications, in order to learn the purpose and nature of the improvements. The instant case is a classic example of the complete frustration of the legislative scheme, which was designed to give a property owner a veto power,[6] after a full and fair disclosure of the proposed improvements.

In Riggins v. District Court of Salt Lake County [7] this court then recognized the principle, when it said:

> . . . Due process of law requires that notice be given to the persons whose rights are to be affected.

How many other *mere details* could be left out of the City's notice of intention—and be shown in the engineer's drawings, on file in the city engineer's office, and yet have a valid notice of intention describing the proposed improvements, in a *general way*? All of them? I submit such could be, under the holding in the main opinion. All the notice of intention would have to give would be a description of the area, announce a beautification project would take place for the purpose of beautifying that area, and, in the event one wanted to be apprised of what was going to happen one could go to the engineer's office and look at the plans and specifications. Certainly that could not find favor. For the same reason, the subject notice should not.

This court, in other municipal situations, follows the principle that where two published notices are required, one will not be sufficient. This for the reason that two notices could well produce wider citizen participation, pro or con. The rationale for requiring two notices has equal force here—to require a notice of intention to describe what the major improvements are could well produce more citizen participation, pro or con.

This state has had too many actions contesting sketchy "notices of intention,"

and far too many unhappy differences have been caused by an unjustified lack of candor, on the part of municipal governments. At the expense of a few more words, reasonable notice of the major improvements could be given—leaving the "mere details" to repose in the office of the engineer.

This is a "notice and opportunity to be heard" matter; and the City failed to comply with the mandatory requirements of 10–16–5(1)(a)(b).

The judgment should be reversed.

---

6. Sec. 10–16–7, U.C.A.1953,. as amended 1969.

7. 89 Utah 183, 217, 51 P.2d 645, 660 (1936).